UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JACENTA R. GRIFFIN,

                                    Plaintiff,

                        -vs-                                          DECISION AND ORDER

ANTHONY DELVECCHIO, SALVATORE V. AMATO, and                          16-CV-6029-CJS-MWP
CITY OF ROCHESTER,

                                    Defendants.
_____


## APPEARANCES

For Plaintiff:                          Charles Francis Burkwit, Esq.
                                        Burkwit Law Firm, PLLC
                                        16 East Main Street, Suite 450
                                        Rochester, NY 14614
                                        (585) 546-1588

For Defendants:                         Patrick Beath, Esq.
                                        Spencer L. Ash, Esq.
                                        City of Rochester
                                        30 Church Street, Suite 400A
                                        Rochester, NY 14614
                                        (585) 428-6812


## INTRODUCTION

**Siragusa, J.** This civil rights case is before the Court on Defendants' motion for summary judgment, ECF No. 37, filed on March 30, 2017, and Plaintiff's cross-motion to amend, ECF No. 44, filed on July 12, 2017. The Court denies both applications and will issue a separate pretrial scheduling order.

## FACTUAL BACKGROUND

Both parties submitted a Rule 56 statement of facts per the Court's local rule of civil procedure. Up to a point in the narrative, the parties all agree on the facts. However, they deviate substantially from the point at which the defendant officers transported Plaintiff to a hospital. The Court will recite the facts as provided by the defense, then discuss the significant deviations separately, if any, right below the factual recitation:

> 5. On the night of February 2, 2015, plaintiff's mother called 911 asking "for a mental hygiene arrest" for plaintiff because plaintiff was intoxicated, arguing with her adult brother, and threatening suicide. *See* Griffin 50-h Examination, annexed to the Beath Declaration as Exhibit B, at 8:11-9:15; Griffin Deposition Transcript, annexed to the Beath Declaration as Exhibit C, at 25:22-26:20; Communications Records, annexed to the Beath Declaration as Exhibit D.

Def.'s Rule 56 Statement ¶ 5, Mar. 30, 2018, ECF No. 40 ("D. Stmt."). Plaintiff disputes that this was a "mental hygiene" arrest, arguing that because the officers failed to obtain permission to transport Plaintiff as required by police department rule, it could not have been an arrest pursuant to New York Mental Hygiene Law §§ 22.09 or 9.41. The Court disagrees. Both sections permit a police officer to transport to a hospital "any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others," N.Y. Mental Hyg. Law § 9.41 (McKinney 2018), or "[a] person who appears to be incapacitated by alcohol and/or substances to the degree that there is a likelihood to result in harm to the person or to others…." N.Y. Mental Hyg. Law § 22.09 (McKinney 2018). Therefore, the Court rejects Plaintiff's legal argument that because the officers failed to follow a departmental procedure, the arrest was no longer authorized under the mental hygiene law.

> 6. During the course of that afternoon and evening, plaintiff had consumed four to five 24-ounce beers, despite the fact that she was on probation after a 2010 DWI conviction, which prohibited her from consuming alcohol. Exh. C at 17:10-25:10; DWI Conviction and Probation Records, annexed to the Beath Declaration as Exhibit E.

2

7. Upon hearing her mother call 911, plaintiff climbed out of a first-floor window in her brother's room.  Exh. C at 31:21-32:9.

8. Plaintiff was wearing an orange jacket or sweatshirt. Transcript of Depositions of Salvatore Amato and Anthony Delvecchio, annexed to the Beath Declaration as Exhibit F, at 37:11-18.

D. Stmt. ¶¶ 6–8. Plaintiff disputes that she was wearing an orange jacket or sweatshirt. At his pretrial deposition, Officer Amato testified as follows:

A. [discussing the 911 printout] So the next entry is a minute later eighteen forty-one we received additional information on the call from dispatch. It looks like a description, black female named Jacenta, last seen wearing an orange jacket, possibly running on Woodman Park.

* * *

Q. What was Ms. Griffin wearing when she was put in the back of the police car; do you know what she was wearing?

A. The only reason I know is because of this, this sheet.

Q. Was it—what does LSW orange jacket mean?

A. LSW is last seen wearing.

Q. Got it.

A. So that's information from her mother to dispatch and dispatch relaying it to us, orange jacket.

Q. Okay. But do you recall if she had an orange jacket on or no?

A. I honestly don't recall that.

Amato Dep. 22:6–10; 37:11–23. Photographs of Plaintiff in the hospital, submitted with Plaintiff's Burkwit affidavit as exhibits, show her wearing an orange zippered sweatshirt with a hood. Burkwit Aff. Ex.s A, B, C, D2, Jul. 12, 2018, ECF No. 44-1. Further, the video at the hospital, timestamped with the time Plaintiff arrived, shows her with an orange top with her hands behind her back and one officer on her left, and one on her right. Def.s' Ex. H (video recording). Plaintiff has failed to submit evidentiary proof that she was not wearing an orange top when arrested.

9. Officers Salvatore Amato and Anthony Delvecchio responded to the 911 call. Exh. F at 17:11-18:12, 121:8-122:14.

10. On that particular evening Officers Amato and Delvecchio were riding together in a police vehicle because there was a snowstorm. Exh. F at 103:15-24.

11. As the officers arrived at plaintiff's Meredith Street home, they saw her standing outside. Exh. F at 31:12-32:2, 123:2-21.

12. The officers exited their car, told plaintiff to stop, and officer Delvecchio handcuffed her. Exh. C at 36:15-37:23; Exh. F at 32:3-10, 123:2-21.

13. Officer Delvecchio escorted plaintiff into the police car while Officer Amato spoke with plaintiff's family members. Exh. C at 38:25-39:4; Exh. F at 32:15-18, 125:17-23.

14. The officers remained at the location for approximately eight minutes, waiting for an ambulance to transport plaintiff to the hospital. Exh. D; Exh. F at 23:3-8, 33:5-36:19, 126:16- 21; TrackStar GPS Data, annexed to the Beath Declaration as Exhibit G.

15. However, the ambulance was significantly delayed by the inclement weather, and plaintiff became increasingly agitated in the back of the officers' car. Exh. F at 23:13-19, 36:5- 37:10, 132:7-132:18, 134:11-135:13, 137:4-22.

D. Stmt. ¶¶ 9–15. Plaintiff disputes that the ambulance was significantly delayed in responding. Officer Delvecchio testified about the wait for the ambulance:

Q. Okay. So how much time went by after you arrived at Ms. Griffin's house; you said that you waited about five minutes in the car approximately?

A. Could have been five to ten minutes.

Q. Okay. And then Officer Amato got back in the vehicle with you at that point?

A. Yes.

Q. And then did you wait at all before you left to go to Rochester General?

A. Yes.

Q. How long did you wait in the car for?

A. A couple minutes until we realized what is going on with Rural Metro, where are they, that's when we went on the radio and said can we get an ETA and by their own words they said another twenty, thirty minutes.

4

Q. So did you cancel the ambulance coming to Ms. Griffin's home?

A. Yes.

Delvecchio Dep. 137:4–22. Officer Delvecchio explained further reasons why he chose to

transport Plaintiff in the police car instead of waiting for the ambulance to arrive, including his

experience arresting Plaintiff on an earlier date and the difficulties involved with using an

ambulance to transport her. Delvecchio Dep. 109–16. As with the prior issue, Plaintiff has not

submitted any evidentiary proof to raise an issue of fact about the ambulance's delay.

According to Defendants:

16. Therefore, the officers decided to transport plaintiff to the hospital them-
selves. *Id.*

17. They radioed ahead to ensure that Rochester General Hospital knew that
they were bringing a mental hygiene detainee to the hospital. Exh. F at 137:23-
138:9.

* * *

18. Plaintiff recalled that the police officers drove her down Meredith Street
toward Culver Road, but could not recall whether the officers ever made it to
Culver Road or where they drove the car after that point. Exh. C at 43:15-44:3.

19. Plaintiff alleges that, after the car had traveled for approximately five
minutes, the officers pulled over to the side of the road, stopped the car, and
both got out of the car and went to the rear passenger door where plaintiff was
sitting. Exh. C at 45:2-14, 47:18-22.

20. Plaintiff did not know where this took place, but claims that it was in a res-
idential area. Exh. C at 46:15-20.

21. When the officers opened the door, plaintiff said "please take me home."
Immediately after she said this, according to plaintiff, Officer Delvecchio el-
bowed her in the face. Exh. C at 48:12-20.

22. Officer Delvecchio's elbow allegedly struck plaintiff in the mouth, knocking
out her top left front tooth. Exh. C at 51:23-53:4.

23. Plaintiff alleges that immediately after being elbowed, she was punched by
Officer Delvecchio in the area of her left eye. Exh. C at 54:6-22.

D. Stmt. ¶¶ 16–23. Plaintiff, though, denies that Officer Delvecchio punched her around her

left eye. Instead, Plaintiff states that after Officer Delvecchio elbowed her she said, "You got

to be fucking kidding me," and immediately thereafter, he punched her, and she blacked out.

Further, according to Defendants:

> 24. Plaintiff describes that at the time she was elbowed and punched she was facing straight ahead with her back flat against the seat. Exh. C at 57:18-59:7.

D. Stmt. ¶ 24. Plaintiff denies that she was facing straight ahead when elbowed and punched.

However, she also states:

> Plaintiff testified that at the time the officers opened the door, she does not recall if she turned towards them. (*See* Beath Declaration – Exhibit C - Griffin Dep. pg. 58, lines 4-5). Admit that while handcuffed, Plaintiff's back was flat against the back seat when she got elbowed and punched. (*See* Beath Declaration – Exhibit C - Griffin Dep. pg. 58, line 6 to pg. 59, line 7). Plaintiff testified at her 50-h hearing that she was sitting sort of slanted, facing towards the window of the car on the right side when she was elbowed directly in her face. (*See* Beath Declaration – Exhibit B - Griffin 50-h, pg. 32, line 16 to pg. 33, line 6).

Pl.'s Response to Def.s' Statement of Undisputed Facts ¶ 24, Jul. 12, 2018, ECF No. 44-10.

During her deposition, she was asked the following question and gave the following response:

> Q. You got elbowed. You got punched and you remained pretty much in that position, because your back was flat against that back seat.
>
> A. Correct.

Griffin Dep. 59:4–7, Mar. 30, 2018, ECF No. 38-3.

> Moreover, Defendants maintain:

> 25. Plaintiff claims that after being punched, she blacked out and did not regain consciousness until she woke up at the hospital strapped to a gurney. Exh. C at 56:2-57:13, 59:8-21.

> 26. Griffin alleges that later, after regaining consciousness, she found her front top left tooth in the pocket of her sweatpants. She did not know how it got there. Exh. C at 65:7-18.

> 27. Griffin alleges that she did not speak to a doctor at any time that she was at the hospital and was never offered any medical treatment for her injuries. Exh. C at 65:19-68:17.

D. Stmt. ¶¶ 25–27. Plaintiff responds:

6

27. Deny that Plaintiff alleges she did not speak with a doctor at any time that she was at the hospital and was never offered any medical treatment for her injuries. Plaintiff acknowledged during her deposition that she does not remember speaking with a doctor at any time when she was at the hospital and does not have any recollection of doctors offering the suture her lip.

Pl.'s Stmt. of Facts ¶ 27.

With regard to Plaintiff's allegation that the officers stopped the car and elbowed and punched her, Defendants have offered the global positioning system tracking of their vehicle (TrackStar GPS reports) showing the police car's movements on the night of Plaintiff's arrest, February 2, 2015:

a. The trip report combines the data from the movement and stop summaries to illustrate where the officers traveled on the night of February 2, 2015. It demonstrates that, at approximately 6:53:13 P.M. the officers stopped in the vicinity of 90 Meredith Street, and remained there for 8:22[1] while speaking with plaintiff and her family and awaiting an ambulance.

b. The trip report indicates that the officers then drove from that location and ultimately made their way to Rochester General Hospital.

c. On the way to the hospital, the officers stopped for 25 seconds near 5 Meredith Street, which is at the intersection of Meredith Street and Culver Road.

d. The officers stopped for 33 seconds near 1862 Culver Road, which is at the intersection of Culver Road and Waring Road.

e. The officers stopped again for 22 seconds in the vicinity of 573 Waring Road, which is at the intersection of Waring Road and Norton Street.

f. The officers then stopped for 51:48 minutes once they reached Rochester General Hospital.

Beath Decl. ¶9a–f, Mar. 30, 2018, ECF No. 38. Defendants argue: "The GPS data does not bear out plaintiff's allegation that the officers pulled over and assaulted her five minutes into the transport or at any time." Def.s' Mem. of Law in Support of Summary Judgment 9, Mar.

---

[1] Presumably eight minutes and twenty-two seconds.

30, 2018, ECF No. 39. Plaintiff responds by stating she "lacks knowledge as to whether the patrol car the Defendant Officers were driving on the night of February 2, 2015[,] was equipped with GPS tracking and whether such technology, if proven reliable, corroborates the Defendant Officers' route to the hospital." Pl.'s Response to Def.s' Statement of Undisputed Facts 29.

Additionally, Defendants have provided corroborating evidence from the hospital's video camera showing their escort of Plaintiff from the police car to the entrance. The video (labeled Channel 13) beginning at 19:01:37 and going to 19:01:43, confirms that Plaintiff was ambulating on her own and that the officers were guiding but not providing support to her. The video demonstrates Plaintiff was conscious when she and the officers arrived at the hospital. Although Plaintiff disputes that the video depicts her, Defendants persuasively argue that the photographs Plaintiff herself submitted showing her in the hospital wearing the orange hooded sweatshirt, corroborate the video and the officers' testimony that she walked in on her own feet, and was not unconscious until strapped to a hospital gurney. Def.s' Ex. H (video recording); Amato Dep. 45:9.

Furthermore, Defendants have submitted the deposition testimony of hospital employees Sharon Bradley and Marcus L. Germonto. Beath Decl., Ex.s I & J. Bradley, Sergeant of Security at Rochester General Hospital, was asked the following questions and gave the following responses:

Q. Then what happened next?

A. By the time I reached my entrance, the police and Ms. Griffin were reaching their entrance, so I was within probably 2 feet of them. She was very vulgar and was actively, like, trying to—she was handcuffed, but actively, like, trying to pull away from the police officers. Her arms were extended pretty far behind her back.

* * *

8

·Q. When you first saw the officers and Ms. Griffin, did you see if she had any visible injuries?

A. She had none.

Q. What's the next thing that happened?

A. She continued to try to pull away. And at that point, she—what I would refer to as, like, a mule-kick—kicked the officer from behind. Like, lifted her knee up into the air and struck him, like, right in the upper thigh, close to the groin area.

Q. At the time that she kicked the officers, where were the officers in relationship to her?

A. One had her by—and I apologize. I can't remember which officer it was—was just holding her by her upper arm as she was trying pull away, so she couldn't run. And then the other officer, I don't believe, had any contact with her at all, that I can recall.

Q. The one that you remember was holding onto her arm, do you remember if that was the officer on her right or her left?

A. I want to say her right. Yes.

Q. So the officer with no contact was the one on the left?

A. Correct.

Q. And when she—you said "mule-kicked." So she kind of kicked her foot up and behind her?

A. Yes. Correct.

Q. And that kick—did that kick strike one of the officers?

A. Yes, it did.

Q. Which of the officers? The one on the right or the left?

A. The right.

Bradley Dep. 8:19–25; 10:4–11:13, Mar. 30, 2018, ECF No. 38-9. Germonto, a security officer at Rochester General Hospital, testified concerning this incident as well. He was asked the following questions and gave the following answers in his pretrial deposition:

Q. So, just generally, then, are you able to tell me what you recall of Ms. Griffin and her presence at the Rochester General Hospital emergency room on February 2, 2015?

A. I recall two RPD officers bringing Ms. Griffin in to our ED department through the ambulance bay. I recall her being loud and boisterous and verbally assaultive towards the officers. I also recall at some point, she tried to break free or tussle—I don't know the word to use—with the officers. She tried to kick and did kick—I don't remember which officer's name she struck with her foot. They, then, secured her to the floor, and she was placed into a room shortly after that to be seen by medical staff.

* * *

Q. Going back to when you first saw the officers escorting Ms. Griffin into the ambulance bay, did you see if Ms. Griffin had any visible injuries at that time when she first walked in?

A. I did not notice any visible injuries at that time, no.

Q. Was she complaining of any injuries?

A. She was not.

Q. And you said later she had some scrapes when she went to the floor. Had you seen those scrapes before the officers took her to the ground?

A. No, I did not.

Germonto Dep. 8:8–22; 15:18–16:5, Mar. 30, 2018, ECF No. 38-10. Defendants have submitted a photograph allegedly showing the footprint of Plaintiff's foot left on Officer Amato's uniform. Beath Decl. Ex. L. Witnesses all describe how the defendant officers took Plaintiff to the ground after she kicked Officer Amato, and that she subsequently suffered injuries to her face as a result. Plaintiff's blood alcohol level when tested at the hospital was 0.345, "significantly elevated," according to Brian S. Greenberg, M.D. Greenberg Dep. 38:22–23, Mar. 30, 2018, ECF No. 38-13. Dr. Greenberg testified that Plaintiff's alcohol level was roughly four times the legal limit for driving in New York. *Id*. 39:4–6. The doctor further testified about the effects of that high a blood-alcohol level: "Severely impairs their judgment. It severely impairs their ability to function normally. But everybody handles it differently, so it varies patient to

patient." *Id*. 39:17–20.

<center>STANDARDS OF LAW</center>

### *Summary Judgment*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, … demonstrate the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and "the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a) (2015). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996) (citation omitted).

The burden then shifts to the non-moving party to demonstrate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Id.* at 249. "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(c)(1). The Court must view the underlying facts contained in affidavits, attached exhibits, and depositions, in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

### Section 1983 Liability

Plaintiff is suing pursuant to 42 U.S.C. § 1983, and the legal principles generally applicable to such claims are well settled:

> In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right. See, e.g., Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

*Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004).

### Fourth Amendment Excessive Force

The foundation for an excessive force claim arising out of an arrest is the Fourth Amendment right "'to be secure in their persons … against unreasonable … seizures.'" *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (quoting U.S. Const. amend. IV). In *Graham*, the Supreme Court explained that,

> proper application [of this standard] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight…. Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Graham v. Connor*, 490 U.S. 386, 394 (1989).

***Qualified Immunity***

"Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In this Circuit, the test for such qualified immunity from suit is to determine if "(1) the official's actions did not violate clearly established law, or (2) even if the actions violated a clearly established law, the official was objectively reasonable in believing in the lawfulness of his actions." *Connecticut v. Crotty*, 346 F.3d 84, 102 (2d Cir. 2003); *See also Ford v. Moore*, 237 F.3d 156, 162 (2d Cir. 2001) (internal citations omitted). In determining if a right was clearly established at the time of the alleged incident, the Second Circuit has identified "three overlapping factors—(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Roniger*, 22 F. Supp. 2d at 162 (citing *Jermosen v. Smith*, 945 F. 2d 547, 550 (2d Cir. 1991)). In determining objective reasonableness, for purposes of a summary judgment motion where defendants raise, as here, qualified immunity from suit, he must demonstrate that "no reasonable jury, viewing the evidence in a light most favorable to the plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *Connecticut*, 346 F.3d at 102 (quoting *Ford*, 237 F.3d at 162) (internal citations omitted).

## ANALYSIS

It is highly unusual for the Court to resolve factual issues for a summary judgment motion, but that is essentially what Defendants are asking the Court to do. Defendants urge

13

the Court to conclude that, based on the evidence submitted in support of their motion, and

the lack of evidence submitted in opposition, the Court should find no material facts at issue

and grant Defendants summary judgment. Defendants rely in part on *Jeffreys v. City of New*

*York*, 426 F.3d 549 (2d Cir. 2005), which held: "At the summary judgment stage, a nonmoving

party 'must offer some hard evidence showing that its version of the events is not wholly fan-

ciful.'" *Id*. at 554 (quoting *D'Amico v. City of N.Y.,* 132 F.3d 145, 149 (2d Cir. 1998)). Defend-

ants claim that Plaintiff's version of events is unsupported by any hard evidence, thus, no

issues of fact exist, and they have shown their entitlement to judgment.

In *Jeffreys*, the Second Circuit answered the following question:

> whether the District Court erred in granting defendants' motion for summary
> judgment on the basis that Jeffreys's testimony—which was largely unsubstan-
> tiated by any other direct evidence—was "so replete with inconsistencies and
> improbabilities" that no reasonable juror would undertake the suspension of
> disbelief necessary to credit the allegations made in his complaint.

*Jeffreys*, 426 F.3d at 551 (internal citation omitted). The plaintiff had alleged that "New York

City police officers…assaulted him before throwing him out of a third-story window." *Id*. The

Court of Appeals held "that, in the circumstances presented—where Jeffreys relied almost ex-

clusively on his own testimony—the District Court did not err in concluding, while determining

whether there were any 'genuine issues of material fact,' that no reasonable jury could have

credited Jeffreys's testimony." *Id*. Jeffreys had confessed to jumping from the third-story win-

dow, but alleged in his complaint that it was police who threw him out of it. He also reported

that the police had beaten him into unconsciousness while he was still in the building, and

that is why he had no recollection of who threw him out the window. The defense presented

evidence from emergency medical personnel who stated Jeffreys had never been uncon-

scious. *Id*. at 552–53.

In the case at bar, not unlike the situation in *Jeffreys*, Plaintiff relies almost exclusively on her own recollection of events. However, unlike the situation in *Jeffreys*, Plaintiff has not changed her story about the unprovoked assault in the police car.

The Court now turns to the use of force at the hospital after Plaintiff allegedly kicked Officer Amato near the groin. Defendants maintain, that to the extent Plaintiff sustained any injuries while in their custody and control, such injuries occurred at the hospital and not in the police car. However, as clarified during oral argument, Plaintiff persists in her position that the injuries, which form the basis of her excessive force claim, did in fact occur while she was in Defendants' police vehicle and that she only sustained an abrasion once inside the hospital. A jury could reject Plaintiff's claim about being beaten in the police car, find that the injuries of which she complains occurred at the hospital, and determine, given her mental and physical state, that these injuries resulted from the use of excessive force at the hospital. In this regard, as an arrestee, Plaintiff must establish her excessive force claim pursuant to the Fourth Amendment, which requires that she prove that an officer's actions were not "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Accordingly, material issues of fact exist, which precludes a grant of summary judgment to Defendants on Plaintiff's excessive force claim.

### Qualified Immunity

The Court now turns its attention to Defendants' contention that Officer Amato would be entitled to qualified immunity on Plaintiff's excessive force claim. Defendants' position presupposes that any injuries suffered by Plaintiff on February 2, 2015, occurred after her arrival at Rochester General and not en route to the hospital as she maintains. In fact, at oral argument Plaintiff's counsel conceded that the only injury she sustained at the hospital was an

abrasion. Since Plaintiff herself has no recollection of what took place immediately upon her arrival at the hospital, the undisputed facts are as follows. Plaintiff, who was handcuffed, was walking under her own power. Officer Amato was on her right, Officer Delvecchio on her left. Officer Amato had his left hand on her. Without warning, Plaintiff "mule kicked" Officer Amato near his groin area, leaving a mark on his trousers. Pursuant to his training, Officer Amato's immediate response was to drop on one knee and take Plaintiff to the ground to get her under control, at which point her face made contact with the floor. Amato Dep. 51:2–52:10; Delvecchio Dep. 125:10–12, 143:6–149:23. Under these undisputed facts, the Court determines, as a matter of law, that Officer Amato would be entitled to qualified immunity with regard to any injuries Plaintiff suffered at the hospital. *Stephenson v. Doe*, 332 F.3d 68, 77 (2d Cir. 2003); *cf. Borton v. City of Dothan*, 734 F. Supp. 2d 1237, 1250 (M.D. Ala. 2010) (police officer not entitled to qualified immunity when he shot mentally ill patient tied down to gurney with Taser gun three times).

### *Motion to Amend*

The Court must freely give leave to amend when justice so requires. Fed. R. Civ. P. 15(a). Granting leave is within the discretion of the Court. *Foman v. Davis*, 371 U.S. 178, 182 (1962). However, Federal Rule of Civil Procedure 16 may limit the ability of a party to amend a pleading if a deadline for doing so is specified in the scheduling order. *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 243 (2d Cir. 2007) ("a district court...does not abuse its discretion in denying leave to amend the pleadings where the moving party has failed to establish good cause, as required by Rule 16(b), to amend the pleadings after the deadline set in the scheduling order.").

The first scheduling order issued by U.S. Magistrate Judge Marian W. Payson on August 17, 2016, ECF No. 17, contains the following pertinent directives:

3. All motions to join other parties and to amend the pleadings shall be filed on or before November 4, 2016. Any third party action shall be commenced on or before November 4, 2016.

* * *

No extension of the above cutoff dates will be granted except upon written application, made prior to the cutoff date, showing good cause for the extension. Application for extensions should be made to the Magistrate Judge.

Scheduling Order at 2 & 4, Aug. 17, 2016, ECF No. 17. Subsequent amended scheduling orders did not change the time for moving to amend. Plaintiff claims to have learned of the facts supporting her motion on February 1, 2017, yet waited until July 12, 2018, one year, five months and almost 2 weeks to move to amend.

Plaintiff cites to this Court's decision and order filed on June 13, 2016, and the following language therein: "The allegations against Delvecchio and Amato cannot be read as anything but intentional conduct. Should evidence arise at trial that the officers acted negligently and not intentionally, Griffin may resort to Federal Rule of Civil Procedure 15(b)(1) to request to amend her complaint." Rule 15(b) is titled, "Amendments During and After Trial." Subdivision one reads as follows:

> ***Based on an Objection at Trial.*** If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.

Fed. R. Civ. P. 15(b)(1). That provision says nothing about amending the pleadings in response to a summary judgment motion.

## CONCLUSION

Material issues of fact prevent the Court from granting Defendants' motion for summary judgment or qualified immunity. Plaintiff made her motion to amend too late. Therefore,

the Court denies Defendants' motion for summary judgment, ECF No. 37, and denies Plaintiff's cross-motion to amend, ECF No. 44. The Court will issue a separate pretrial scheduling order.

IT IS SO ORDERED.

DATED:     December 18, 2018
              Rochester, New York

<div align="center" style="text-align:right">

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge

</div>